UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITE NATIONAL RETIREMENT | : | CASE NO.  3:07-CV-0773 |
| FUND, f/k/a ILGWU NATIONAL | : | (CAPUTO) |
| RETIREMENT FUND and EDGAR | : | |
| ROMNEY and STEVEN THOMAS | : | |
| as Trustees of the UNITE NATIONAL | : | *Electronically Filed* |
| RETIREMENT FUND, | : | |
| Plaintiffs | : | |
| v. | : | |
| ROSAL SPORTSWEAR, INC., | : | |
| ROSE BONI a/k/a ROSA BONI, | : | |
| CATALDO BONI a/k/a ALDO J. BONI, | : | |
| TONIA BONI, LORENA BONI and | : | |
| PAT BONI, | : | |
| Defendants | : | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO BAR DISCOVERY
CONCERNING CHANGES IN ASSESSED
WITHDRAWAL LIABILITY**

As noted by Plaintiffs in their letter submission of August 28, 2008 concerning the discovery dispute before the Court, Defendants are seeking discovery "concerning the calculation of the underlying amount of withdrawal liability and any

efforts or proceedings by the Fund to collect withdrawal liability from other employers or entities.…" What Defendants seek is information and documents for purposes of challenging the calculation of the following twenty (20) items contained in Exhibit D of Plaintiffs' Memorandum—the Fund's letter dated March 6, 2003 to Rosal Sportswear, Inc., advising Rosal that on account of its withdrawal from the ILGWU Retirement Fund in 2002, Rosal's withdrawal liability amount was $226,086.00:

> "4.    Unamortized amount as of December 31, 2001 of the reallocated non-collectible during 1982 .................. $402,200
>
>                               * * *
>
> 9.    Unamortized amount as of December 31, 2001 of the reallocated non-collectible during 1983 ............... $1,376,900
>
>                               * * *
>
> 14.    Unamortized amount as of December 31, 2001 of the reallocated non-collectible during 1984 .................. $481,200
>
>                               * * *
>
> 18.    Unamortized amount as of December 31, 2001 of the unfunded present value of vested benefits for withdrawal liability purposes determined as of December 31, 1985 ...................................................... $ -6,153,200
>
>                               * * *
>
> 24.    Unamortized amount as of December 31, 2001 of the reallocated non-collectible during 1986 ............... $3,247,700
>
>                               * * *
>
> 29.    Unamortized amount as of December 31, 2001 of the reallocated non-collectible during 1987 ............... $5,156,300
>
>                               * * *

34.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1988 ............... $7,024,400

* * *

39.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1989 ............... $7,292,000

* * *

44.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1990 ............... $9,113,800

* * *

49.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1991 ............... $5,949,800

* * *

54.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1992 ............... $8,836,600

* * *

59.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1993 ............. $15,555,700

* * *

64.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1994 ............... $9,203,500

* * *

69.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1995 ............. $24,998,800

* * *

74.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1996 ............. $33,728,000

* * *

79.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1997 ............. $14,342,000

* * *

84.   Unamortized amount as of December 31, 2001 of
the reallocated non-collectible during 1998 ............... $7,683,100

* * *

3

89.  Unamortized amount as of December 31, 2001 of
     the reallocated non-collectible during 1999 ............... $9,482,700

* * *

94.  Unamortized amount as of December 31, 2001 of
     the reallocated non-collectible during 2000 ............. $14,916,500

* * *

99.  Unamortized amount as of December 31, 2001 of
     the reallocated non-collectible during 2001 ........... $24,441,500"

As will be discussed in greater detail later, the above-noted twenty (20) items of calculation are items of calculation mandated by the presumptive method of calculation of withdrawal liability by Section 4211(b)(4)(B)(iii) of ERISA, 29 U.S.C. §1391(b)(4)(B)(iii).

To understand the depth and complexity of the issues raised by this discovery dispute—and ultimately a dispute as to defenses that Defendants intend to raise in this matter—it is necessary to examine the general framework of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA).

In 1974 Congress enacted the Employee Retirement Income Security Act (ERISA), 29 USC §1001, et seq., establishing a comprehensive and complex scheme for regulating private pension plans.  Among the principal objectives of ERISA was the development of a system that would guarantee that promised benefits be paid to those workers who had met the conditions required to attain a

"vested" status within the terms of the plan.  *See* <u>Nachman Corp. v. Pension Benefit Guaranty Corp.</u>, 446 U.S. 359 (1980).

By 1980, however, it became clear to Congress that ERISA's scheme for multiemployer plans contained some structural defects which threatened the plans' ability to maintain and ensure funding of vested benefits.  ERISA lacked a mechanism to protect a multiemployer plan from losses occasioned by an employer's decision to terminate participation in, or to withdraw from, the plan without having fully funded future claims against the plan.  The difficulty was perhaps best described by the Executive Director of the Pension Benefit Guaranty Corporation in his testimony to Congress:

> "A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal.  Employer withdrawals reduce a plan's contribution base.  This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities.  The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base.  This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue."

<u>Pension Benefit Guarantee Corp. v. R.A. Gray & Co.</u>, 467 U.S. 717, 722, n.2 (1984) (quoting *Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means*, 95th

Cong., 2d Sess., 22 (1978) (statement of Matthew M. Lind)).  Thus it was per-

ceived that the failure in ERISA to discourage or prevent the "downward spiral" of

withdrawals by employers would result in the inability of the plans to fund their

obligations to vested pensioners.

In response, Congress enacted MPPAA, establishing a mechanism by which

an employer that decides to withdraw from a multiemployer pension plan incurs

"withdrawal liability" intended to cover that employer's share of the unfunded

vested benefits in existence at the time of withdrawal.  *See* 29 U.S.C. §§1381,

1391.

The method of calculating withdrawal liability utilized by the Fund in this

case assigned to Rosal a portion of the Fund's unfunded obligations in rough pro-

portion to Rosal's relative participation in the Fund.  As a result, Rosal gained no

advantage *vis-a-vis* the Fund from the act of withdrawal and those employers re-

maining in the Fund do not become responsible for funding an inordinate share of

the vested benefits that will become payable.

MPPAA sets forth four complex alternative formulas by which multiem-

ployer pension plans can calculate withdrawal liability.  *See* 29 U.S.C. §§1391(b),

(c).  The Fund in this case has utilized the "presumptive" method described in 29

U.S.C. §1391(b).  See Exhibit D to Defendants' Memorandum: "[b]y application

of Section 4211(b) of ERISA…we have computed the unfunded vested benefits allocable to the Firm (Firm's UVB)"

The presumptive method allocates withdrawal liability to the withdrawing employer in a manner that generally requires the employer to fund a share of the increase in the Fund's unfunded vested benefits during the period of its obligation to contribute, and, if it contributed to the trust prior to September 26, 1980 (the effective date of MPPAA), it must also fund a share of the Fund's unfunded liability for the unfunded vested benefits for that period.  Under the presumptive method, withdrawal liability consists of three components: (1) the employer's proportional share of the change in the Fund's unfunded vested benefits for plan years ending *after* September 25, 1980; (2) if the employer was obligated to contribute to the Fund for plan years beginning *before* September 26, 1980, it must pay its proportional share of the unfunded vested benefits for that period; and (3) liability for any reallocated vested benefits.  In essence, the Fund calculates the unfunded vested liability for the Fund as a whole and then determines the employer's proportionate share.

MPPAA recognizes that some withdrawal liability owed by other employers will not be collected.  29 U.S.C. §1391(b)(4)(B).  A portion of what is called the reallocated UVBs must be paid by the remaining employers–that is what is at issue

in this discovery dispute at the present time.  The reallocated UVBs are computed on a year-by-year basis.  The portion to be paid by a withdrawing employer is determined in the following manner.

The amount of the reallocated UVBs with respect to a plan year is the sum of:

1.      amounts the plan sponsor determines in the plan year will be uncollectible because of bankruptcy or similar proceedings, 29 U.S.C. §1391(b)(4)(B)(i);

2.      amounts that the plan sponsor determines in that plan year will not be assessed against employers as a result of the *de minimis* rule, the 20-year cap on the payment schedule, or the limitation on withdrawal liability for sales of assets, if a notice of the amount of liability and a schedule of payments have been sent to the employer whose liability is reduced for such a reason, 29 U.S.C. §1391(b)(4)(B)(ii);

3.      amounts the plan sponsor determines to be uncollectible or unassessable in that plan year, 29 U.S.C. §1391(b)(4)(B)(iii).

Congress also enacted with MPPAA a very detailed procedure to challenge trustee determinations concerning the calculation of the withdrawal liability.  Dis-

putes concerning withdrawal liability are subject to arbitration under 29 U.S.C. §1401(a) and to judicial review under 29 U.S.C. §1404(b).

For purposes of arbitration proceedings, the trustees' determination under 29 U.S.C. §§1381-1399, 1405, is presumed correct pursuant to 29 U.S.C. §1401(a)(3)(A) unless the party challenging the determination in arbitration shows by a preponderance of the evidence that it was unreasonable or clearly erroneous. Similarly, in the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct pursuant to 29 U.S.C. §1404(a)(3)(B) unless the challenger in arbitration shows by a preponderance of the evidence that the actuarial assumptions and methods were unreasonable or that the plan's actuary erred significantly.  The courts in discussing or deciding the validity of these statutory presumptions of correctness have uniformly upheld them over due process and other constitutional challenges.  See Republic Industries, Inc. v Central Pennsylvania Teamsters Pension Fund, 534 F. Supp. 1340 (E.D. Pa. 1982), *rev'd in part,* 693 F.2d 290, wherein the district court, dismissing the plaintiff successor-in-interest company's complaint because of the failure to exhaust administrative remedies, partly reasoned that, in effect, the presumption of correctness of 29 U.S.C. §1401(a)(3)(A), which was assailed on Fifth Amendment grounds, and the other challenged provisions of the MPPAA were not clearly and

unambiguously in violation of constitutional requirements.  The Third Circuit held that the district court was wrong to compel arbitration, on the rationale that because the successor mounted a facial challenge to the Act's constitutionality and because arbitration could neither moot the constitutional issues by resolving the matter on non-constitutional grounds nor develop a factual matrix for the later resolution of the issues by the judiciary, arbitration did not provide an adequate remedy for the successor's claims, and it would be futile to require exhaustion.

MPPAA also provides for judicial proceedings on the completion of arbitration.  29 U.S.C. §1401(c) provides that in any judicial proceeding a presumption, rebuttable only by a clear preponderance of the evidence, exists that the arbitrator's factual findings were correct.  This presumption has similarly been challenged on due process grounds, and it has also been assailed by a contention that the presumption of correctness accorded to arbitrators' findings by 29 U.S.C. §1401(c) and the mandatory arbitration provisions of 29 U.S.C. §1401(a) unconstitutionally vest judicial functions in persons who lack the tenure and salary protections of Article III Section 1 of the United States Constitution.  Just like the presumptions of correctness under Section 1404(a)(3), the comparable presumption under 29 U.S.C. §1401(c) has been uniformly held constitutional.

Defendants now seek to avoid the complex statutory provisions with respect to the calculation of withdrawal liability and the mandatory statutory provisions relating to the challenging of trustee calculation of withdrawal liability.

In challenging the trustees' calculation of withdrawal liability in this matter, Defendants are asking the Court to ignore 29 U.S.C. §1391(b)(4)(B)(iii), and to substitute its own judgment in deciding whether the trustees of the Fund prudently exercised their fiduciary discretion accorded them by 29 U.S.C. §1391(b)(4)(B)(iii) in arriving at their calculation of "unamortized amount…of the reallocated non-collectible.…"

Next the Defendants want this Court to ignore the statutory presumptions of correctness accorded the decisions of the Trustees, having not challenged any of those decisions through arbitration.

Lastly, Defendants have raised an "equitable" argument seeking to trump the statutory provisions of MPPAA discussed and detailed above.

The Seventh Circuit in <u>Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co., Inc.</u>, 788 F.2d 428 (7th Cir. 1986), has addressed and rejected the notion that equity trumps the very complex statutory scheme of withdrawal liability set forth in MPPAA.

> "Second, even if we could be persuaded that the policy objectives of the MPPAA would not be served by imposing withdrawal li-

ability in this case, we would have to reject the defendant's argument. Congress did not merely select a broad policy goal and instruct the courts to achieve that objective. Rather, Congress itself decided what rules, and exceptions to those rules, would best achieve its goals. The statutory language is the most reliable indicator of congressional intent. *See* Monterey Coal v. Federal Mine Safety & Health Review Commission, 743 F.2d 589, 598 (7th Cir. 1984). We have held that "the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *In re* Cash Currency Exchange, 762 F.2d 542, 552 (7th Cir.), *cert. denied sub nom.* Fryzel v. Cash Currency Exchange, ___ U.S. ___, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985). Hence we are bound by the particular rules enacted by Congress and are not free to carve out our own exceptions merely because we believe they would not undermine Congress' goals. Our recent opinion in United States v. Medico Industries, Inc., 784 F.2d 840 (7th Cir. 1986) is instructive:

> A legislature that seeks to achieve a goal...can do so in one of two ways. First, it may identify the objective and instruct courts or agencies to design rules to achieve more of that objective. This method permits fine tuning in individual cases at the expense of imprecision and uncertainty in the run of cases. Second, Congress may pick the rules itself and make them the measure of the objective. The selection of the rule denotes what the goal is worth to Congress, how best to achieve that goal, where to stop in pursuit of the goal. See Mercado v. Calumet Federal Savings & Loan Ass'n., 763 F.2d 269, 271-72 (7th Cir. 1985). Any rule of this character will overshoot in some respects and fall short in others. In other words, it will be overbroad and have loopholes at the same time. Yet a court may not convert a rule into a general standard without reversing the choice Congress made. When Congress chooses the rule rather than the objective, a court must turn aside claims of the sort Medico makes-that its conduct does not undercut the legislature's objective and therefore should be permitted.

Medico, at 844-45. The Supreme Court also has recently made similar observations:

The "plain purpose" of legislation, however, is deter-
mined in the first instance with reference to the plain language
of the statute itself. Richards v. United States, 369 U.S. 1, 9, 82
S.Ct. 585, 590, 7 L.Ed.2d 492 (1962). Application of "broad
purposes" of legislation at the expense of specific provisions
ignores the complexity of the problems Congress is called upon
to address and the dynamics of legislative action. Congress
may be unanimous in its intent to stamp out some vague social
or economic evil; however, because its Members may differ
sharply on the means for effectuating that intent, the final lan-
guage of the legislation may reflect hard fought compromises.
Invocation of the "plain purpose" of legislation at the expense
of the terms of the statute itself takes no account of the proc-
esses of compromise and, in the end, prevents the effectuation
of congressional intent. Board of Governors of the Federal Re-
serve System v. Dimension Financial Corporation, 474 U.S.
361, 106 S.Ct. 681, 688-89, 88 L.Ed.2d 691 (1986).

788 F.2d at 433-434

The Seventh Circuit then went on to specifically reject the employer's equi-

table argument that an argument of unjust enrichment should trump MPPAA:

Defendant argues that if withdrawal liability is imposed the
Fund will be unjustly enriched. We do not think that there is any un-
just enrichment; withdrawal liability has been mandated in this case
by a valid statute. In Johnson v. United States, 602 F.2d 734, 738-39
(6th Cir. 1979), the Sixth Circuit held that the district court could not
use its equitable powers to deny enforcement of a mandatory provi-
sion of the tax law. The Sixth Circuit then relied upon Clark v. Bar-
nard, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883), in which the
Supreme Court stated:

The Supreme Court has recently decided that the with-
drawal liability provisions of the MPPAA are valid under the
clause of the fifth amendment that forbids the taking of private

property for public use without just compensation.  <u>Connolly v. Pension Benefit Guaranty Corp.</u>, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

Accordingly, where any penalty of forfeiture is imposed by statute upon the doing or omission of a certain act, there courts of equity will not interfere to mitigate the penalty or forfeiture, if incurred, for it would be in contravention of the direct expression of the legislative will.…  [A] court of equity ha[s] no right to interfere, and, by injunction or decree, to virtually repeal the express provisions of a positive statute, or defeat their operation in the particular case.  108 U.S. at 457, 2 S.Ct. at 890.  In any event, as we have noted above, we think Congress's choice of exceptions appears rational in terms of which events affecting an employer would be likely to impair the economic base of the Plan and which would not.

788 F.2d at 434.

For all of the foregoing reasons, Defendants should not be permitted to obtain through oral examination the following:

"2.    Preparation and delivery of the statement of Estimated Potential Withdrawal Liability for Rosal Sportswear, Inc., dated August 19, 2002.…"

"3.    Changes in the amount of withdrawal liability attributed to Rosal Sportswear, Inc. between August 19, 2002 and March 6, 2003, and the reason(s) therefore, specifically whether the amount changed as a result of settlements or compromises reached with other members and/or participants of the Atlantic Apparel Contractors Ass'n, Inc. and/or International Ladies Garment Workers' Union."

"4.    Settlements and/or compromises of alleged withdrawal liability reached with other participants in the Atlantic Apparel Contractors Ass'n, Inc. and/or International Ladies Garment Workers' Union during the period from January 1, 1999 to the present."

14

Also, Defendants should be precluded from obtaining from Plaintiffs the following

documents:

> "1.    Documents sufficient to show the amount of any settle-
> ment and/or compromise of any alleged withdrawal liability assessed
> against any member(s) or participant(s) of the Atlantic Apparel Con-
> tractors Ass'n, Inc. and/or International Ladies Garment Workers' Un-
> ion during the period from January 1, 1999 to the present as well as
> the name of each settling member(s) and/or participant(s) and the
> amount of withdrawal liability initially assessed against each."

<div style="margin-left:40%">

Respectfully submitted,
CHARLES W. JOHNSTON, P.C.
Suite 203, 150 Corporate Center Drive
Post Office Box 98
Camp Hill, Pennsylvania 17001-0098
Telephone: (717) 975-5500
Facsimile: (717) 975-5511

/s/ CHARLES W. JOHNSTON
Pa. I.D. No. 15621
e-mail: cjohnston@jadlegal.com

*Attorneys for Plaintiffs*

</div>

Dated:        October 14, 2008

## CERTIFICATE OF SERVICE

I, Charles W. Johnston, Esquire, hereby certify that I have this date served Plaintiffs' Reply Memorandum of Law in Support of Motion to Bar Discovery Concerning Changes in Assessed Withdrawal Liability upon the following through this Court's Electronic Case Filing System:

Donna A. Walsh, Esquire
Daniel T. Brier, Esquire
MYERS BRIER & KELLY, LLP
425 Spruce Street, Suite 200
Scranton, PA  18503

*Attorneys for Defendants*

CHARLES W. JOHNSTON, P.C.
Suite 203, 150 Corporate Center Drive
Post Office Box 98
Camp Hill, Pennsylvania 17001-0098
Telephone: (717) 975-5500
Facsimile: (717) 975-5511

/s/ CHARLES W. JOHNSTON
Pa. I.D. No. 15621
e-mail: cjohnston@jadlegal.com

*Attorneys for Plaintiffs*

Dated:          October 14, 2008