**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITE NATIONAL RETIREMENT FUND, f/k/a ILGWU NATIONAL RETIREMENT FUND and EDGAR ROMNEY and STEVEN THOMAS as Trustees of the UNITE NATIONAL RETIREMENT FUND,<br><br>Plaintiffs,<br><br>v.<br><br>ROSAL SPORTSWEAR, INC., ROSE BONI, a/k/a ROSA BONI, CATALDO BONI a/k/a ALDO J. BONI, TONIA BONI, LORENA BONI and PAT BONI<br><br>Defendants. | CIVIL ACTION NO. 3:07-CV-00773<br><br>(JUDGE CAPUTO) |

**MEMORANDUM**

Presently before the Court are the Motion for Summary Judgment of Plaintiffs UNITE National Retirement Fund, Edgar Romney, and Steven Thomas (Doc. 39) and the Motion for Summary Judgment of Defendants Rose Boni, Cataldo Boni, Tonia Boni, Lorena Boni, and Pat Boni. (Doc. 43.) Because a genuine issue of material fact exists regarding whether Rosal, Inc. was simply an alter-ego of Rose Boni and whether the evasion of withdrawal liability was a principal purpose of the transactions between Rosal, Inc. and the other named defendants, the motions will be denied.

The Court has jurisdiction over the claims arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1337, and the Court exercises supplemental jurisdiction over Plaintiffs' state law claims in Count I.

**BACKGROUND**

On April 25, 2007, Plaintiffs filed their Complaint, in which they alleged that Plaintiff UNITE National Retirement Fund is a multiemployer employee pension benefit plan within the meaning of Sections 3(2) and (37) of the Employee Retirement Income Security Act of 1974 ("ERISA"), *as amended*, 29 U.S.C. § 1002(3) and (37). (Compl., Doc. 1 ¶ 8.) Plaintiffs Edgar Romney and Steven Thomas are trustees and fiduciaries of the fund who are authorized to bring civil actions on behalf of the fund, its participants, and beneficiaries, for the purpose of collecting withdrawal liability. (*Id.* ¶¶ 10-11.)

Defendant Rose Boni was at all relevant times the sole shareholder and chief executive officer of Defendant Rosal, Inc ("Rosal"). (*Id.* ¶ 12-13.) All other defendants are members of the Boni family. (*Id.* ¶¶ 14-17.) Rosal was incorporated in 1984, with Rose Boni as the sole shareholder of the corporation. (Doc. 45, Ex. D; Doc. 42, Ex. F.) Rosal was engaged in the garment sewing business, and from 1991-2002, Rosal's work exclusively came from Tama Manufacturing ("Tama"). (Doc. 42, Ex. C, Aldo Boni Dep. 12:17-13:17, Apr. 20, 2009). In October 2002, Tama notified Rosal that Tama would no longer be able to provide Rosal with garment manufacturing work. (Aldo Boni Dep. 16:11-16:19.) Tama suggested that some military work might be forthcoming for Rosal, but such work never materialized. (Aldo Boni Dep: 18:6-19:1, 32:12-32:20.) Ultimately, Rosal was not able to find any work to replace the loss of the Tama account and went out of business.

After it received notice that it would no longer be getting work from Tama, Rosal continued to conduct various business activities through April 2003. (Doc. 42, Ex. O.)

According to Rosal's records for the fourth quarter of 2002, Rose and Cataldo ("Aldo") Boni were each paid twenty-eight thousand dollars ($28,000), Pat Boni was paid fourteen thousand dollars ($14,000) and Tonia Boni was paid ($7,000). (Doc. 42, Ex.) On 2003, Rosal's payroll records show that Rose, Pat and Aldo Boni were paid twelve thousand dollars ($12,000) by Rosal. (Doc. 42, Ex. M.) Rosal's tax records for the fiscal year from October 1, 2002 to September 30, 2003, show an asset of nineteen thousand seven hundred two dollars ($19,702.00) in shareholders' loans at the beginning of the year, but no such asset at the end of the fiscal year.[2] (Doc. 42, Ex. E.) However, Rosal's Cash Receipts Journal for the relevant time period does not show any receipt for the repayment of these loans. (Doc. 42, Ex. N.)

The declaration provided by Defendants' CPA, Martin Rapoport, accounts for this discrepancy by claiming that Rosal wrote off the loans to Rose Boni "to clear the corporate records and recognize the loans as income to Rose Boni." (Doc. 45, Ex. C.) Mr. Rapoport points to Rosal's Out of Existence/Withdrawal Affidavit as showing a net distribution of thirty thousand two hundred thirty-six dollars ($30,236.00) to Rose Boni. (*Id.*) This figure represents the cash payout to Rose Boni consisting of the loan write-off and two hundred sixty-nine dollars ($269.00) from Rosal's checking account, plus the market value of Rosal's three automobiles, less seventeen thousand two hundred thirty-five dollars ($17,235.00) in "union liability." (*Id.*) According to Rapoport, the only cash that Boni actually received was the remaining money from Rosal's checking account. (*Id.*)

---

[1] Rosal's payroll register for 2002 show that both Rosa and Cataldo Boni both earned more than one hundred thousand dollars that year. (Doc. 42. Ex. L.)

[2] As noted earlier, Rose Boni was Rosal's sole shareholder.

3

Rapoport's Declaration also contends that Rosal was not insolvent at the time it lost the Tama account, was well-capitalized up to the time of dissolution, did not commingle funds, and was not a sham corporation. (*Id*.)

Plaintiffs allege that Rosal was required to make contributions to the pension fund on behalf of its employees pursuant to Rosal's collective bargaining agreement with the International Ladies' Garment Workers' Union, and was an employer within the meaning of section 3(5) of ERISA. (Compl., Doc. 1, ¶¶ 19-20.) When Rosal permanently ceased its manufacturing operations, effecting a "complete withdrawal" from the pension fund, it became liable to the fund for withdrawal liability under section 4201(a) of ERISA. (*Id.* ¶¶ 21-22.)

As of August 19, 2002, the fund estimated that Rosal's potential withdrawal liability was seventeen thousand two hundred thirty-five dollars ($17,235.00). (Doc. 42., Ex. I.) According to Aldo Boni's deposition, he had received assurance that any amount of liability under fifty thousand dollars ($50,000) would likely be sufficiently small that the fund would not seek repayment. (Aldo Boni Dep., 40:11-41:4.) On March 6, 2003, after Rosal had begun winding down business operations, the pension fund notified Rosal of two hundred twenty-six thousand and eighty-six dollars ($226,086.00) in withdrawal liability and demanded payment. (Doc. 42, Ex. J.) Rosal failed to pay or to exercise its options under ERISA of requesting a review of the fund's determination or initiating arbitration. (*Id.* ¶¶ 25, 27.) The pension fund gave proper written notice to Rosal of its default in payment. (*Id.* ¶ 26.)

The pension fund then commenced a civil action in the United States District Court

for the Southern District of New York to recover the withdrawal liability, along with interest, statutory liquidated damages, attorneys fees, and costs, but after service of process, Rosal failed to appear, answer, or defend this civil action. (Doc. 42, Ex. A.) As a result, on March 4, 2004, the court entered a Judgment in Default against Rosal for the liability and interest accrued to date, which equaled two hundred fifty thousand, nine hundred seventy-two dollars and thirty-two cents ($250,972.32), plus post-judgment interest. (Doc. 42, Ex. B.) On May 10, 2004, the judgment against Rosal was entered on the docket of the United States District Court for the Eastern District of Pennsylvania, and the pension fund then commenced supplemental proceedings in that court to locate assets of Rosal and related entities and individuals to satisfy the judgment. (Doc. 1, ¶¶ 31-32.) In the course of those supplemental proceedings, Plaintiffs discovered that Rosal no longer has any assets or property of record. (*Id.* ¶¶ 33-34.)

Plaintiffs then filed the instant suit, alleging violations of ERISA in Counts I, II, and III, and violations of Pennsylvania state law in Counts IV through IX. On September 14, 2007, this Court dismissed counts IV through IX as preempted by ERISA. (Doc. 15.) On June 16, 2009, Plaintiffs filed a motion for summary judgment on Counts I and III, arguing that the Court should pierce the corporate veil of Rosal and impose personal liability on Rose Boni, and that the transactions between Rosal and the Bonis in the months before it went out of business should be disregarded because the principal purpose of those transactions was to avoid or evade withdrawal liability. (Docs. 39-40.) In Plaintiffs' brief, they announced that they were no longer pursuing recovery on Count II, leaving only Counts I and III before this Court. (Doc. 40.)

On June 16, 2009, Defendants also filed a motion for summary judgment, arguing

5

that there is no basis to pierce the corporate veil and that the payments to the Bonis were not intended to evade or avoid withdrawal liability. (Docs. 43, 45.) Both parties filed briefs in support with their motions for summary judgment. (Docs. 40, 45). On July 22, 2009, both parties also filed briefs in opposition. (Docs. 51-52.) On August 7, 2009, Defendants filed their reply brief (Doc. 54); Plaintiffs did not file a reply brief. Accordingly, the current motion has been thoroughly briefed and is now ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983). The moving party

may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

### I.  Triggering Withdrawal Liability

Congress enacted ERISA in 1974 to "address the increasingly-apparent insecurity of workers' vested pension funds." *DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 454 (3d Cir. 2003). However, as originally enacted, ERISA did not penalize employers for withdrawing from underfunded pension plans, as long as the plans stayed solvent for five

years after the withdrawal. *See Milwaukee Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995). Worried that this scheme would create incentive for employers to withdraw from pension plans, Congress passed the Multiemployer Pension Plan Amendments Act ("MPPAA") in 1980, which imposed withdrawal charges on employers who withdrew from underfunded pension plans. *Id*. at 417. Pursuant to 29 U.S.C. § 1381(a), an employer who either completely or partially withdraws from a multiemployer plan is liable to the plan for an amount determined by the MPPAA's calculation system.

Under 29 U.S.C. § 1383(a)(2), a complete withdrawal from a multiemployer plan occurs whenever an employer "permanently ceases all covered operations under the plan." The date of complete withdrawal is the date of "the cessation of covered operations." 29 U.S.C. § 1383(e). The Third Circuit Court of Appeals has held that the term "covered operations" is ambiguous and has construed its definition with help from the legislative history. *See Crown Cork & Seal Co. v. Central States Southeast and Southwest Areas Pension Fund*, 982 F.2d 857, 865-66 (3d Cir. 1992). In *Crown Cork*, the court read the legislative history of the MPPAA to mean that complete withdrawal occurs under § 1383(a)(2) whenever an employer engages in a "substantial cessation of normal business activity." *Id.* at 866.

In this case, the record clearly indicates, and defendants admit, that the number of payroll checks issued by Rosal dropped from forty-four (44) for the week ending October 5, 2002, to seven (7) for the week ending October 12, 2002. (Doc. 42, Ex. L.) Defendants also admit the last payment from Tama, Rosal's only source of business, was received

on October 10, 2002. (Doc. 42, Ex. N.) The drastic drop in payroll, coupled with the loss of business from Rosal's only supplier of work, shows that there was a substantial cessation of Rosal's normal business activities sometime between October 6, 2002 and October 10, 2002. As a result, Rosal permanently ceased covered operations under the plan, thereby completely withdrawing from the fund. As a result, Rosal incurred withdrawal liability at that time.

## II.     Piercing the Corporate Veil in ERISA cases

Although the term "employer" is defined in Title I of ERISA at 29 U.S.C. § 1002(5), there is no definition for the term under Title IV, which covers the MPPAA. *See* 29 U.S.C. § 1301. The Supreme Court has held that the definitions from Title I of ERISA do not carry over to Title IV because the definition sections are limited by the phrase "for purposes of this title." *See Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 369-70 (1980) (discussing ERISA definition of "nonforfeitable"). Many Circuit Courts of Appeals have specifically held that the definition of employer in Title I is not applicable to Title IV and the MPPAA. *E.g. DeBrecenci v. Graf Bros. Leasing, Inc.*, 828 F.2d 877, 879-880 (1st Cir. 1987) (declaring that courts must define the term "employer" for purposes of MPPAA).

Many courts have refused to include shareholders and officers as "employers" for the purposes of Title IV, unless they have acted as alter egos of the corporation such that piercing of the corporate veil is justified. *See Connors v. P & M Coal Co.*, 801 F.2d 1373, 1378 (D.C. Cir. 1986) (internal citations omitted). Some Courts of Appeals have been highly protective of the corporate form, protecting the principle of limited liability and

refusing to impose withdrawal liability on shareholders and officers. *See, e.g.*, *DeBrecenci*, 828 F.2d at 880. However, several other courts, including the Third Circuit Court of Appeals have held that in "alter ego liability cases involving claims to pension benefits protected by ERISA, as amended by the MPPAA, there is 'a federal interest in supporting disregard of the corporate form to impose liability.'" *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) (quoting *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 460-61 (7th Cir. 1991)). In *Foodtown*, the court applied New Jersey corporate law and held that the plaintiffs' allegations were sufficient to support a claim that defendant's actions were used to perpetrate fraud and that piercing the corporate veil might be appropriate. *Id.* at 172-73.

The Third Circuit Court of Appeals has articulated its own test for determining whether the corporate veil should be pierced because a corporation is simply an alter ego for its shareholders or officers. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001). The factors that should be considered are: 1) gross undercapitalization, 2) failure to observe corporate formalities, 3) failure to pay dividends, 4) insolvency of debtor corporation, 5) siphoning funds from the debtor corporation by a dominant stockholder, 6) nonfunctioning of officers and directors, 7) lack of corporate records, and 8) whether the corporation is a facade or sham for the operations of the dominant stockholder. *Id.* at 484-85 (citing *American Bell, Inc. v. Fed. of Telephone Workers of Pennsylvania*, 736 F.2d 879, 886 (3d Cir. 1984). The court has also noted that this test is not rigid or exclusive, but rather part of the inquiry of whether the equitable remedy of piercing the corporate veil is appropriate because the corporation is but a legal fiction. *Trustees of the*

*Nat'l Elevator Indus. Pension, Health Benefit and Educational Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003).

In the instant case, there is sufficient question of material fact on both sides such that summary judgment is inappropriate at this time. Plaintiffs allege that Rosal was simply an alter ego for the sole shareholder, Rosa Boni, and therefore she should be held personally liable for the withdrawal liability incurred by Rosal. Defendants, on the other hand, claim that Rosal followed sufficient corporate formalities to protect Rose Boni from personal liability as the principal shareholder.

There are facts that would suggest that Rosal was a sham corporation under the Third Circuit's alter ego test. It does not appear that Rosal ever paid dividends to Rose Boni, its only shareholder. Furthermore, Rose Boni used the corporation to loan herself over nineteen thousand dollars ($19,000). However, rather than paying off those debts to the corporation, Rosal simply wrote them off and forgave Rose's debt. This suggests a siphoning off of funds from the corporation.

Conversely, there are facts to suggest that Rosal sufficiently followed corporate formalities such that the principle of limited liability should be respected. Mr. Rapoport's declaration points to Rosal's tax returns to show that the corporation was not insolvent and was well capitalized up through dissolution. Furthermore, Rosal filed separate income tax returns, kept records regarding the corporation's finances, and maintained a separate checking account, thereby avoiding a commingling of funds.

Because there is genuine issue of material fact, each party is required to show that they are entitled to judgment as a matter of law. However, the alter ego test is a fluid, fact sensitive inquiry. Neither party has sustained its burden of proving that they are entitled to

11

judgment as a matter of law, despite the *Foodtown* court's relaxed protection of the corporate form. Therefore, summary judgment on Count I is inappropriate at this time, and both parties' motions for summary judgment on this count will be denied.

**III.     Evading or Avoiding Withdrawal Liability**

Pursuant to 29 U.S.C. § 1392(c), "[i]f a principal part of any transaction is to evade or avoid" withdrawal liability, the obligation to contribute to the fund continues "without regard to such transaction." The terms transactions, evade, and avoid are not defined by the MPPAA and therefore must be construed in accordance with their ordinary and natural meaning. *Supervalu, Inc. v. Board of Trustees of the Southwestern Pennsylvania and Western Maryland Area Teamsters and Employers Pension Fund*, 500 F.3d 334, 340 (3d Cir. 2007) (citing *United States v. E.I. DuPont De Nemours & Co., Inc.*, 432 F.3d 161, 171 (3d Cir. 2005)). In *Supervalu*, the Third Circuit Court of Appeals defined all three of these terms and determined that "under a plain language statutory reading the provision applies when a contributing employer enters a transaction with a principal purpose of escaping its duty to pay withdrawal liability to the plan or fund." *Id.* at 390-91.

The evasion of withdrawal liability need not be the only purpose, but only "one of the factors that weighed heavily in the seller's thinking." *Santa Fe Pacific Corp. v. Central States Southeast and Southwest Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994). Some courts have held that Congress used "a principal purpose" rather than "the principal purpose," which suggests that an employer should not be held liable for evading its responsibilities to the fund where one of its purposes was to evade withdraw liability, but that purpose was a "minor, subordinate purpose." *Id.* Of course, the statute's

12

language also suggests that an employer can have more than one principal purpose in engaging in a given transaction. *See Sherwin-Williams v. New York State Teamsters Conference Pension and Retirement Fund*, 158 F.3d 387, 395 (6th Cir. 1998) (declaring that MPPAA's language clearly states that "an employer can have more than one principal purpose in conducting a transaction").

When a transaction has been undertaken with a principal purpose of avoiding withdrawal liability, at least one Court of Appeals has held that the MPPAA allows federal courts to reach the parties to whom the assets or cash have been transferred. *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993). The court in *IUE AFL-CIO* based its conclusion on a reading of § 1392(c) with § 1451(a)(1) as conferring federal courts with subject matter jurisdiction over any party if that party's act or omission adversely affects any plan participant. *Id.* However, this Court need not decide whether the Second Circuit's reasoning is persuasive because it is unclear whether any of Rosal's transactions were primarily to evade or avoid withdrawal liability.

There certainly is evidence in the record to suggest that at least one principal purpose of the transactions in the months following Tama's notice to Rosal was to avoid withdrawal liability. Despite knowing that Rosal was subject to withdrawal liability if it were to withdraw from the fund, Rosal continued to pay tens of thousands of dollars in salary and benefits to the sole shareholder and her relatives. Rather than sell the automobiles to a third party or demand loan repayment from its sole shareholder, the corporation distributed those assets to Rose Boni and wrote off the outstanding debt. Although Defendants Out Of Existence/Withdrawal Affidavit shows that Rosal set aside an amount

13

equal to the original August 2002 estimate of withdrawal liability, it lists these transactions as taking place on September 30, 2003, which is well after the March 2003 date that the fund alerted Rosal to its higher withdrawal liability number. These transactions are sufficient to create an issue of material fact suggesting that a principal purpose of these transactions was to avoid withdrawal liability.

However, in Defendants' Out of Existence/Withdrawal Affidavit, it appears that Rosal subtracted seventeen thousand two hundred thirty-five dollars ($17,235.00) for "union liability" from the amount it disbursed to Rose Boni, an amount equal to the withdrawal liability originally estimated in the Union's August 2002 letter. Also, much of the salary paid to the Boni family was received in the last quarter of 2002. The 2003 payroll records show that Pat, Rosa and Aldo Boni were paid one thousand dolllars ($1,000) per week for twelve (12) weeks in 2003. According to Defendants, this salary was paid for services rendered in the wrapping up of corporate business, was only half of the salary that these defendants had earned in 2002, and the payments stopped being made in March 2003. Tonia Boni did not receive any salary in 2003. This is consistent with Aldo Boni's deposition testimony that Rosal was holding out hope that the military contract would come through, but realized that no such contract would materialize in February or March 2003.

Also, Aldo Boni's deposition suggests that he was under the impression that the original August 2002 estimate would likely not subject him to any exposure to the fund, as the amount he owed was relatively small and not likely to be pursued by the fund. The record shows that Rosal was not alerted to its higher liability estimate until March 6, 2003. Thus, many of the questioned transactions may have occurred before Rosal and the Boni

14

family were even aware of their liability at all. Even if the transactions were to avoid the smaller liability estimate, there is a genuine issue of fact as to whether this was a major purpose sufficient to impose liability under 29 U.S.C. § 1392(c), or a minor purpose that would excuse Defendants' transactions.

Therefore, there is a genuine issue of material fact regarding the purpose or purposes of the transactions that Rosal entered into while it was dissolving. Neither party has proven that it is entitled to judgment as a matter of law, therefore both parties' motions for summary judgment on Count III will be denied.

## CONCLUSION

For the foregoing reasons, the Court will deny both Plaintiffs' Motion for Summary Judgment (Doc. 39) and Defendants' Motion for Summary Judgment (Doc. 43.).

An appropriate Order follows.

| | |
|---|---|
| <u>October 1, 2009</u><br>Date | <u>/s/ A. Richard Caputo</u><br>A. Richard Caputo<br>United States District Judge |

15

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITE NATIONAL RETIREMENT FUND, f/k/a ILGWU NATIONAL RETIREMENT FUND and EDGAR ROMNEY and STEVEN THOMAS as Trustees of the UNITE NATIONAL RETIREMENT FUND, <br><br> Plaintiffs, <br><br> v. <br><br> ROSAL SPORTSWEAR, INC., ROSE BONI, a/k/a ROSA BONI, CATALDO BONI a/k/a ALDO J. BONI, TONIA BONI, LORENA BONI and PAT BONI <br><br> Defendants. | CIVIL ACTION NO. 3:07-CV-00773 <br><br> (JUDGE CAPUTO) |

### ORDER

**NOW**, this <u>1st</u> day of October, 2009, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED** and Defendants' Motion for Summary Judgment is **DENIED**.

.

                                              /s/ A. Richard Caputo
                                              A. Richard Caputo
                                              United States District Judge